NATHANIEL BRAMS and EIREEN BRAMS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Brams v. Commissioner
Docket No. 9639-77.
United States Tax Court
T.C. Memo 1980-584; 1980 Tax Ct. Memo LEXIS 13; 41 T.C.M. (CCH) 678; T.C.M. (RIA) 80584; December 30, 1980
*13 Bernard A. Kansky, for the petitioners. Thomas P. Dougherty, Jr., for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined a deficiency of $ 27,499.50 in petitioners' 1973 income tax. The sole issue to be decided is the proportion of proceeds received by petitioners upon the sale of their family business which is properly allocable to a covenant not to compete. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly.
Petitioners were married and resided in Fort Lauderdale, Florida, when they filed their petition in this case. They filed a joint Federal income tax return for the year in question with the Internal Revenue Service Center at Andover, Massachusetts. Nathaniel Brams (hereinafter Mr. Brams) founded Salad House, Inc. (hereinafter Salad House) some 25 years ago and was its sole shareholder until he sold it in 1968. Mr. Brams worked long hours and extended weeks building Salad House into a successful manufacturer of commercial salads and, with the help of his wife and son, his company prospered. By 1967, its net earnings were approximately $ 90,000 per *14 year. Much of Salad House's success was due to Mr. Brams' ability to adapt standard commercial food processing machinery to his company's specific needs. He improved efficiency without sacrificing quality, and thus Salad House could produce salad faster than its competitors. In addition, Mr. Brams oversaw all aspects of the business from manufacturing to distribution, and was responsible for all major decisions. Eireen Brams (hereinafter Mrs. Brams) was an employee of Salad House from its inception. After the early years, she did much of the selling and public relations work of the business. She developed personal contacts with many of Salad House's customers. She was not responsible for developing any of the efficiency improvements, although she acquired working knowledge of the techniques created by her husband.
Petitioners' son, Robert Brams (hereinafter Robert), worked at Salad House on a part-time basis from the age of 9 until he finished his second year of college at age 20. He then became a full-time employee of Salad House and acquired broad familiarity with the total business operations. At some time after the sale of Salad House, Robert opened a commercial bakery *15 named Best Maid, Inc. Milton Popkin (hereinafter Popkin) has been a Salad House employee since the late fifties. He began as the bookkeeper, and was delegated substantial managerial responsibility by Mr. Brams beginning in late 1967. Between that time and the date of Salad House's sale on October 31, 1968, Mr. Brams put in fewer hours at Salad House than had been his custom, and Popkin assumed correspondingly more control of the day-to-day operation of the business. Popkin's elevation coincided with the onset of Mr. Brams' ill-health. Mr. Brams developed severe chest discomfort, and saw a doctor for diagnosis and treatment at least as early as March 1968. Although the initial diagnosis was that Mr. Brams suffered from a hiatus hernia, it was determined in April of 1969 that he had been suffering from arteriolosclerotic heart disease with angina. During this same period from late 1967 through October 1968, Mr. Brams often was depressed and found it increasingly difficult to deal effectively with the daily Salad House routine. Also at this time, Mr. Brams began negotiating through Popkin with one Matthew G. Matteosian (Matteosian), president and a substantial shareholder *16 of G. D. Mathews & Sons, Inc. (the buyer), for the sale of Salad House. In November of 1967, Mr. Brams rejected an offer of between $ 300,000 and $ 330,000. However, on October 31, 1968, a sale was agreed to by the parties with a total purchase price of $ 360,000. The buyer did not know of Mr. Brams' ill health at this time. Mr. Brams decided upon the minimum price he would accept by determining the amount of money he would require to live comfortably in retirement. The price offered by the buyer was determined by lawyers and accountants for the buyer to be the fair worth of Salad House. Although Mr. Brams attended almost every negotiation session, the primary negotiator for Salad house was Popkin. Further, Mr. Brams relied upon Popkin's representations that the sale contract was favorable (including the tax consequences) to him. The sale contract is extremely detailed and specifically allocates $ 80,000 of the purchase price to the name "Salad House, Inc." and its accompanying goodwill, $ 130,000 to the remaining assets of Salad House, and $ 150,000 to a covenant by petitioners payable in installments only to Mr. Brams and obligating each of the petitioners and Robert *17 not to directly or indirectly engage, or become interested, in the manufacture or sale of specified food products in the New England area for a period of 10 years. Neither Mrs. Brams nor Robert received anything in exchange for their signing the covenant. Neither Mr. Brams nor Matteosian broke down (in his own mind) the purchase price into specific amounts for goodwill, tangible assets, and the noncompetition agreement. The buyer never employed anyone to verify that petitioners and Robert were satisfying the terms of the covenant. However, it was common knowledge among those in the trade that petitioners were vacationing in Florida.In addition, Robert once desired to manufacture certain of the products listed in the covenant not to compete, and he asked Matteosian for permission to do so. That permission was refused. OPINION This case is another in a long line where the issue is whether a party to an agreement involving the sale of a business should be bound by an allocation made in the agreement of sale to a covenant not to compete. Resolution of the issue will determine whether the payments received by Mr. Brams in respect of the covenant should be treated as ordinary income, *18 as respondent contends, or should be attributable to the sale of the assets of the business (particularly its good will) and treated as long-term capital gain, as petitioners contend. Respondent has not sought herein to apply the so-called "mistake, undue influence, fraud, duress, etc." rule of , presumably because this Court has not adopted that rule and continues to adhere to the so-called "strong proof" standard -- a standard which also prevails in the Fifth Circuit Court of Appeals to which an appeal in this case would lie. See ; . The "strong proof" rule has been the subject of divergent views among the courts in respect of whether it rests on the intention of the parties, "economic reality," or a combination thereof. See . Cf. . We find it unnecessary to probe the nuances of the *19 difference between, or overlap of, the aforesaid two prongs of the rule, since we conclude that the petitioners, who have the burden of proof ( ; see also ), have failed to carry their burden whichever prong is applied. See . In passing, we note, however, that this Court has indicated a preference for the "economic reality" prong. See . As to the parties' intent, we are not persuaded that they did not intend to make the allocation set forth in the agreement. An examination of the agreement for the sale of the Salad House Business shows that it was very carefully tailored to cover every element of the the transaction and petitioners have not demonstrated that the allocation was inserted only after the negotiations had been completed and the terms agreed upon. Cf. . To be sure, there was some testimony which indicates that Mr. Brams *20 may not have considered the covenant not to compete of any importance or may not have fully understood its tax implications. But the record clearly shows that he participated in most of the negotiating sessions, that he read the agreement before he signed it, and that its terms were explained to him. Moreover, although Matteosian's testimony has some overtones of lack of concern over the possibility of competition, he repeatedly testified that he understood that the agreement contained the covenant and that he relied upon it. Moreover, we think it significant that Matteosian refused Robert's request to be released from his obligation not to compete. Thus, it cannot be said that the buyer did not value the covenant. Cf. . Under the foregoing circumstances, we cannot say that petitioners have offered the requisite "strong proof" that the terms of the agreement did not comport with the intention of the parties. As to "economic reality," we are satisfied that Mr. Brams' illness should not be elevated to the level of "strong proof" that the covenant did not have substantive meaning. In the first place, the buyer was not aware *21 that Mr. Brams was ill at the time the agreement was consummated. Indeed, his illness was not diagnosed until more than one year after the sale of the business. Second, there are clear indications that, even taking his illness into account, Mr. Brams could have used his knowledge (both technical know-how and business acumen) to join forces with others in order to enter into competition. The fact that he might not have been able to work as hard as he had in the past and that others might have had to carry the laboring oar of day-to-day operations of the competing business is not enough to provide a "strong proof" foundation based upon Mr. Brams' illness. Moreover, the covenant bound Mrs. Brams and Robert as well as Mr. Brams, and there was no evidence establishing their inability to compete. See pp. 11-12, infra. We similarly reject petitioners' attempt to analyze the financial aspects of the business in order to show that the other elements of that business, i.e., the net assets and goodwill, were of such great value as to absorb most, if not all, of the total amount paid in respect of the covenant not to compete, with the result that the covenant should not be accorded *22 any value. The evidence of record simply does not support such analysis. The amount allocated ($ 150,000 of a total sale price of $ 360,000) was not so excessive as to undermine its own credibility. Cf. , affg. a Memorandum Opinion of this Court; . In short, we conclude that petitioners have not carried their burden of proof in respect of "economic reality". Petitioners' reliance on , is totally misplaced. In that case, the Court of Appeals refused to set aside the original allocation to a covenant not to compete despite a subsequent written modification thereof, stating that there was insufficient evidence under the "strong proof" rule to justify relieving the parties from the tax consequences of the original allocation. See . If anything, that case would appear to support respondent's position herein; in any event, it is clearly distinguishable. Petitioners further argue that, because "the covenant not to compete was so broad as to encompass persons who *23 had no interest in the stock of Salad House, Inc., and were not active in the management of the business," it is invalid as repugnant to the public policy of Massachusetts. There are several problems with petitioners' position. First, Mrs. Brams and Robert were active participants in the business, and the fact that they received no payment for their agreement has no significance.[1] Second, it is clear to us that, under Massachusetts law, the covenant not to compete is reasonable because it accorded the buyer the amount of protection it reasonably needed.
Marine Contractors Co., Inc. v. ; . [2] We think it highly likely that both Mrs. Brams and Robert could have utilized their knowledge of the Salad House business to have been able to compete with the buyer, Cf. . Finally, even if the covenant not to compete were invalid under Massachusetts law, such invalidity would not change the character of the amounts received *24 in respect thereof nor their taxability to Mr. Brams. [3] Cf. ; see ; . *25 Petitioners' last argument is that they should not be bound by their contractual allocation because Popkin, who negotiated the contract on their behalf, so petitioners allege, was unfaithful and perhaps even dishonest. Even if established, such facts would not undermine the Commissioner's determination; if any relief is appropriate, it can only be obtained in some other forum. Decision will be entered for the respondent. Footnotes
1. Petitioners make no argument that a portion of the payments to Mr. Brams should be allocated to Robert and taxable to him. ↩
2. Neither party furnished us with any analysis of Massachusetts law. Petitioners cite in support of their contention only . Yet, as petitioners recognize, that case explicitly excludes from its condemnation all noncompetition agreements which are ancillary to the sale of a business and reasonably designed to protect the buyer. It is therefore clearly distinguishable. ↩
3. Certainly, to the extent that the intent of the parties is the test of allocability, invalidity of the agreement would have no effect. Cf. . In terms of "economic reality," petitioners were paid for covenant they gave and implemented so that the substantive nature of the payments are clear, irrespective of the legal force of the agreement.↩